1
2
3
4
## UNITED STATES DISTRICT COURT
5
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 6 GARY KILBOURNE, *on behalf of* | Case No.: 14cv984-MMA (BGS) |
| 7 *himself and all others similarly situated, and on behalf of the general public,* | **ORDER:** |
| 8 | **AFFIRMING TENTATIVE** |
| 9 Plaintiff, | **RULINGS;** |
| 10 | [Doc. No. 130] |
| 11 v. | |
| 12 THE COCA-COLA COMPANY; | **GRANTING IN PART** |
| 13 COCA-COLA REFRESHMENTS USA, INC.; and BCI COCA-COLA | **ADMINISTRATIVE MOTIONS TO FILE DOCUMENTS UNDER** |
| 14 BOTTLING COMPANY OF LOS | **SEAL;** |
| 15 ANGELES, | [Doc. Nos. 108, 117, 123] |
| 16 Defendants. | **DENYING PLAINTIFF'S** |
| 17 | **REQUEST FOR JUDICIAL** |
| 18 | **NOTICE;** |
| 19 | [Doc. No. 125] |
| 20 | |
| 21 | **DENYING DEFENDANTS' MOTION TO STRIKE THE** |
| 22 | **DECLARATION OF KEVIN M. TAYLOR;** |
| 23 | |
| 24 | [Doc. No. 119] |
| 25 | **DENYING PLAINTIFF'S MOTION** |
| 26 | **FOR CLASS CERTFICATION** |
| 27 | [Doc. No. 111] |
| 28 | |

- 1 -

1   Plaintiff Gary Kilbourne brings this putative wage and hour class action against

2   Defendants the Coca-Cola Company, Coca-Cola Refreshments USA, Incorporated,

3   and BCI Coca-Cola Bottling Company of Los Angeles (collectively, "Defendants" or

4   "Coca-Cola" [1]).  Pursuant to Federal Rule of Civil Procedure 23, [2] Plaintiff moves to

5   certify two subclasses of current and former Coca-Cola employees for his "off-the-

6   clock" claims and derivative claims for waiting time penalties under California Labor

7   Code section 203, and unfair business practices in violation of California Business

8   and Professions Code section 17200, *et. seq.*  On July 20, 2015, the parties appeared

9   before the Court for a hearing on Plaintiff's motion for class certification.  Having

10  considered the parties' submissions and oral argument of counsel, the Court

11  **AFFIRMS** its tentative ruling and **DENIES** Plaintiff's motion for class certification.

<u>BACKGROUND</u>

13  Plaintiff Kilbourne worked as a non-exempt delivery driver for Coca-Cola's

14  Oceanside Distribution Center from approximately November 2007 to February 11,

15  2013.  According to Plaintiff, he and other Coca-Cola drivers "are invoicing and

16  driving from customer-to-customer locations while clocked out for lunch" and

17  "despite a policy of prohibiting off-the-clock work, members of the putative class

18  have consistently worked off-the-clock without compensation, Coca-Cola knew this

19  was occurring but stood idly by."  Plf.'s Mot. at 6, 8.

---

[1] At the outset, the Court notes that the parties dispute which entity is the employer of the Class—Plaintiff asserts that the three entity Defendants are co-employers, while Defendants maintain that BCI Coca-Cola Bottling Company of Los Angeles ("BCI") is the sole employer of Plaintiff Kilbourne and other putative class members.  In his motion, Plaintiff suggests in passing that whether the three Defendants are co employers is also a common question to the class.  Defendants, however, assert that this issue will be raised, if needed, in a summary judgment motion after certification.  In light of the Court's conclusion that certification of Plaintiff's off-the-clock and derivative claims is not appropriate under Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3), the Court does not reach the issue of whether the three Defendants are co-employers.  Accordingly, the Court references the Defendants collectively as "Coca-Cola" for purposes of simplicity only.

[2] Any further reference to "Rule" refers to the Federal Rules of Civil Procedure unless otherwise noted.

Plaintiff now moves for certification of a California class of 1,445 current and former Coca-Cola employees for unpaid off-the-clock claims and derivative claims. Plaintiff proposes the following two subclasses:

> All individuals who are or were employed by Coca-Cola Refreshments USA, Inc. and/or BCI Coca-Cola Bottling Company of Los Angeles and/or The Coca-Cola Company as a driver in California at any time from March 20, 2010, to the present.

> All individuals who were employed by Coca-Cola Refreshments USA, Inc. and/or BCI Coca-Cola Bottling Company of Los Angeles and/or The Coca-Cola Company as a driver in California, but whose employment terminated sometime between March 20, 2010, to the present.

Plaintiff asserts that his claims are suitable for class certification because Coca-Cola has a *de facto* policy and/or practice of drivers working while clocked out for lunch, and that a common method of proof exists—Coca-Cola's own records—to show drivers worked while off the clock, and Coca-Cola had constructive knowledge of such work.

## PRELIMINARY MATTERS[3]

### A.    Administrative Motions to File Documents Under Seal

The parties each move to file certain documents[4] under seal on the grounds that Defendants have identified the information as confidential, constituting trade secrets,

---

[3] Plaintiff requests that the Court take judicial notice of the 2013 State of the Judiciary in San Diego County Report and Executive Summary, attached as Exhibit 1, and the May 2013 Report of the State of the Division of Labor Standard Enforcement, attached as Exhibit 2.  Because the Court resolves the matters herein without reference to either exhibit, the Court **DENIES** Plaintiff's request for judicial notice [Doc. No. 125].

[4]  The documents are as follows:
1.    Plaintiff's *unredacted* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification [Doc. No. 110];
2.    The Declaration of William Turley in Support of Plaintiff's Motion for Class Certification and Exhibits attached to the Declaration of William Turley in Support of Plaintiff's Motion for Class Certification [Doc. No. 110-1];
3.    Declaration of Kevin M. Taylor [Doc. No. 110-25];

1   confidential research, development, or commercial information pursuant to the

2   Protective Order entered in this action [Doc. No. 88].  *See* Doc. Nos. 108, 117, 123.

3   Plaintiff takes no position as to whether the identified information should be sealed,

4   but claims to have filed its documents under seal in an abundance of caution.

5   　　　Courts have historically recognized a "general right to inspect and copy public

6   records and documents, including judicial records and documents." *Nixon v. Warner*

7   *Commc'ns, Inc.*, 435 U.S. 589, 597, n.7 (1978).  "Unless a particular court record is

8   one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting

9   point." *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir.

10  2006) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir.

11  2003)).  Courts treat records attached to dispositive motions differently than records

12  attached to non-dispositive motions.  *Id.* at 1178–80.  "Those who seek to maintain

13  the secrecy of documents attached to dispositive motions must meet the high

14  threshold of showing that 'compelling reasons' support secrecy" whereas "[a] 'good

15  cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-

16  dispositive motions."  *Id.* at 1180.  To do so, the party must present "articulable facts"

17  ─────────────────────────

18  　　4.  Defendants' *Unredacted* Memorandum of Points and Authorities in Opposition to Plaintiff's

19  　　　　Motion for Class Certification [Doc. No. 118-13];

　　　　5.  *Unredacted* excerpts from the Deposition Transcript of Len Lamkin, attached as Exhibit 67

20  　　　　to Defendants' Compendium of Declaration Excerpts in Support of Defendants' Opposition

　　　　to Plaintiff's Motion for Class Certification [Doc. No. 118-12];

21  　　6.  *Unredacted* excerpts from the Deposition Transcript of Gregory Lee Jones, attached as

22  　　　　Exhibit 68 to Defendants' Compendium of Declaration Excerpts in Support of Defendants'

　　　　Opposition to Plaintiff's Motion for Class Certification [Doc. No. 118-12];

23  　　7.  *Unredacted* exhibits 3, 7, and 9 through 18 attached to Defendants' Compendium of

　　　　Plaintiff-Specific Documents and Human Resource Documents which consists of

24  　　　　Defendants' policies, driver itineraries, Plaintiff's personal cell phone records, and employee

　　　　complaints, each of which contain proprietary and confidential business information and/or

25  　　　　private information [Doc. Nos. 118-1–118-6];

26  　　8.  *Unredacted* exhibits 19 through 23 attached to Defendants' Compendium of Operations

　　　　Documents which consists of documents relating to Defendants' operational practices [Doc.

27  　　　　Nos. 118-9, 118-10];

　　　　9.  Plaintiff's *unredacted* Reply Memorandum of Points and Authorities in Support of

28  　　　　Plaintiff's Motion for Class Certification [Doc. No. 124].

1   identifying the interests favoring sealing, and show that these specific interests

2   overcome "the presumption of access by outweighing the public interest in

3   understanding the judicial process." *Kamakana*, 447 F.3d at 1178–79. "Even under

4   the 'good cause' standard of Rule 26(c), however, a party must make a 'particularized

5   showing' with respect to any individual document in order to justify sealing the

6   relevant document." *In re High Tech Employee Antitrust Litig.*, No. 11cv02509-

7   LHK, 2013 WL 163779, at *2 (N.D. Cal. Jan. 15, 2013) (internal citations omitted).

8   "Broad allegations of harm, unsubstantiated by specific examples or articulated

9   reasoning, do not satisfy the Rule 26(c) test." *Id.* (citing *Beckman Indus., Inc. v. Int'l*

10  *Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)).

11      The Ninth Circuit has yet to address which standard—good cause or

12  compelling reason—applies to motions for class certification. Many district courts

13  within this Circuit have found that a class certification motion is non-dispositive

14  because it addresses Rule 23's procedural requirements. *See, e.g.*, *Rich v. Hewlett-*

15  *Packard Co.*, No. 06cv03361-JF, 2009 WL 2168688, at *1 (N.D. Cal. July 20, 2009)

16  ("The contested issues in Plaintiffs' motion for class certification involve the

17  procedural requirements of F.R. Civ. Pro. 23 and relate only tangentially to the

18  underlying merits of Plaintiffs' claim. The motion thus is not 'dispositive' in the

19  relevant sense, and a showing of good cause is sufficient to justify filing these

20  documents under seal."). However, other courts have recognized that a motion for

21  certification *could* be dispositive where "a denial of class status means that the stakes

22  are too low for the named plaintiffs to continue the matter." *See Prado v. Bush*, 221

23  F.3d 1266, 1274 (11th Cir. 2000); *see e.g.*, *Rosales v. El Rancho Farms*, No.

24  09cv0707, 2014 WL 321159, at *3 (E.D. Cal. Jan. 29, 2014) ("[A] motion for class

25  certification is dispositive because the motion is one that will affect whether or not

26  the litigation proceeds.") (internal citation omitted); *Algarin v. Maybelline, LLC*, No.

27  12cv3000 AJB DHB, 2014 WL 690410, at *2 (S.D. Cal. Feb. 21, 2014) (reasoning

28  the compelling reason standard applied because the denial of class certification likely

1 equated to the "death knell" where the plaintiffs only alleged *de minimis* individual

2 damages).

3       Here, Defendants move to seal the above documents under the "good cause"

4 standard on the grounds that the proposed sealed documents contain proprietary and

5 confidential business information that could be used for commercial advantage if

6 known to Defendants' competitors.  The Court agrees that the good cause standard

7 applies because the procedural requirements of Rule 23(a) and 23(b)(3) are primarily

8 at issue.  *See Rich*, 2009 WL 2168688, at *1.  It is well settled that "sources of

9 business information that might harm a litigant's competitive standing often warrant

10 protection under seal."  *Williams v. U.S. Bank Nat. Ass'n*, 290 F.R.D. 600, 604–05

11 (E.D. Cal. 2013) (quoting *Nixon*, 435 U.S. at 598).  Further, the Ninth Circuit has

12 recognized that a litigant's trade secrets warrant sealing from the public.  *See In re*

13 *Elec. Arts, Inc.*, 298 Fed. App'x 568, 569 (9th Cir. 2008) (recognizing a "trade secret

14 may consist of any formula, pattern, device or compilation of information which is

15 used in one's business, and which gives him an opportunity to obtain an advantage

16 over competitors who do not know or use it").  Defendants have filed a supplemental

17 declaration under seal[5] detailing with particularity the exhibits that contain

18 confidential information and the manner in which disclosure of such information

19 would be detrimental to Defendants or otherwise improper.  The Court finds

20 Defendants have demonstrated good cause to seal the exhibits and information

21 identified.  Accordingly, the Court **GRANTS IN PART** the administrative motions

22 to seal [Doc. Nos. 108, 117, 123] and **ORDERS** as follows:

23       1.    The following exhibits shall be filed under seal:

24             a.    Defendants' Exhibit 7;

25             b.    Defendants' Exhibit 67;

26             c.    Plaintiff's Exhibits 81, 82, 83, 84, 85, 86, 92, 128, 190, 191, 192;

27

28 [5] Per the Court's tentative ruling [Doc. No. 130] and as discussed during the hearing, Defendants' supplemental declaration shall be filed under seal [Doc. No. 132].

1           d.     Plaintiff's Exhibit E.

2        2.     The following exhibits shall be filed in their <u>redacted</u> form:

3           a.     Defendants' Exhibits 17, 18, 19, 21, and 23;

4           b.     Plaintiff's Exhibit 72;

5           c.     Plaintiff's Exhibit 156.

6        3.     Defendants have withdrawn their request to file the following Exhibits

7    under seal, and therefore the following exhibits shall be <u>publicly available</u>:

8           a.     Defendants' Exhibits 2, 9, 10, 11, 12, 13, 14, 15, 16, 20, 22

9           b.     Plaintiff's Exhibits 114, 115, 193

10          c.     Defendants' Exhibit 68.

11   Within 14 days of the date of this Order, the parties shall file a redacted version of

12   each exhibit to the extent they have not already done so.[6]

13   **B.    Defendants' Motions to Strike and Evidentiary Objections**

14       Defendants move to strike the Declaration of Kevin M. Taylor in its entirety,

15   which Plaintiff submitted in support of his Motion for Class Certification.  *See* Doc.

16   No. 119.  Defendants also move to strike the declarations of approximately 30

17   putative class members on the grounds that they are identical, lack personal

18   knowledge, lack articulable facts, and offer only vague and conclusory statements.

19   Alternatively, Defendants have also filed a slew of evidentiary objections to the class

20   member declarations, asserting various statements made within the drivers'

21   declarations are conclusory, lack foundation, represent a legal conclusion, are

22   speculative, and assume facts not in evidence.  *See* Doc. No. 120-1.

23       In determining whether class certification is appropriate under Rule 23, courts

24   "may consider all material evidence submitted by the parties . . . and need not address

25   the ultimate admissibility of evidence proffered by the parties."  *Coleman v. Jenny*

26   *Craig, Inc.*, No. 11CV1301-MMA (DHB), 2013 WL 6500457, at *3 (S.D. Cal. Nov.

27

28

---

[6] Plaintiff shall also file a redacted version of his reply brief, Doc. No. 124.

27, 2013) (citing *Gonzalez v. Millard Mall Servs.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012)); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975); *Keilholtz v. Lennox Hearth Prods.*, 268 F.R.D. 330, 337 (N.D. Cal. 2010) ("On a motion for class certification, the Court may consider evidence that may not be admissible at trial."). As another court in this district has explained:

> Since a motion to certify a class is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) (The class certification procedure "is not accompanied by the traditional rules and procedures applicable to civil trials."). At the class certification stage, "the court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims." *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011), quoting *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 616 (C.D. Cal. 2008). Therefore, the Court may consider inadmissible evidence at the class certification stage. *Keilholtz v. Lennox Hearth Prods, Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010). "The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the [Motion for Class Certification]." *Alonzo*, 275 F.R.D. at 519.

*Gonzalez*, 281 F.R.D. at 459. Moreover, as this Court has previously recognized, "the fact that the declarations are virtually identical does not ipso facto render them incompetent, particularly at this stage of the proceeding where the Court is applying a lenient standard of review." *See Coleman*, 2013 WL 6500457, at *3 (citing *Bollinger v. Residential Capital, LLC*, 761 F. Supp. 2d 1114, 1120 (W.D. Wash. 2011) ("But at this stage, under a lenient standard, the use of similarly worded or even 'cookie cutter' declarations is not fatal to a motion . . .")).

In light of the lenient evidentiary standard that applies at the certification stage, the Court **DENIES** Defendants' motions to strike the declarations of Kevin M. Taylor and the putative class members and **OVERRULES** Defendants' evidentiary objections for purposes of this motion. The Court reiterates that to the extent any evidence proffered by the parties constitutes a legal conclusion, speculation, or lacks

personal knowledge, the Court will not consider such material.  *See Coleman*, 2013 WL 6500457, at *3 (citing *Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("Objections on any of these grounds are simply superfluous in this context.")).

**CLASS CERTIFICATION**

**A.     Legal Standard**

Federal Rule of Civil Procedure 23 governs the certification of a class.  Fed. R. Civ. P. 23.  "Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).  Here, Plaintiff moves for certification of two subclasses of current and former Coca-Cola drivers under Rule 23(a) and 23(b)(3).

Rule 23(a) requires a party seeking class certification to establish the following four elements:

> (1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation).

*Id.* at 980 (citing Fed. R. Civ. P. 23(a)).  The United States Supreme Court has made clear that "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (hereinafter "*Dukes*").  Instead, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Id.*

At the certification stage, district courts must "engage in a 'rigorous analysis' of each Rule 23(a) factor when determining whether plaintiffs seeking class certification have met the requirements of Rule 23."  *Ellis*, 657 F.3d at 980.  "In many

1  cases, that 'rigorous analysis' will entail some overlap with the merits of the

2  plaintiff's underlying claim." *Id.* (internal citation and quotation omitted).  "[T]he

3  merits of the class members' substantive claims are often highly relevant when

4  determining whether to certify a class.  More importantly, it is not correct to say a

5  district court may consider the merits to the extent that they overlap with class

6  certification issues; rather, a district court *must* consider the merits if they overlap

7  with the Rule 23(a) requirements." *Id.* at 981 (emphasis in original).

8     Once the prerequisites of Rule 23(a) are met, the Court must then determine

9  whether the class action is maintainable under Rule 23(b).  "Under Rule 23(b)(3), a

10  class may be certified if the district court 'finds that the questions of law or fact

11  common to class members predominate over any questions affecting only individual

12  members, and that a class action is superior to other available methods for fairly and

13  efficiently adjudicating the controversy.'" *Vinole v. Countrywide Home Loans, Inc.*,

14  571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)).  A central

15  concern of the Rule 23(b)(3) predominance test is whether "adjudication of common

16  issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc.*,

17  253 F.3d 1180, 1189 (9th Cir. 2001) *opinion amended on denial of reh'g*, 273 F.3d

18  1266 (9th Cir. 2001).  "The party seeking certification bears the burden of

19  demonstrating that he has met the requirements of Rule 23(b)." *Vinole*, 571 F.3d at

20  944 n.9.

21  **B.**  **Factual Background**

22     Coca-Cola produces and distributes its products throughout the United States.

23  Coca-Cola has approximately 20 Distribution Centers located throughout California,

24  from the Redding/ Eureka area in the north to San Diego/ El Centro in the south.

25  Each distribution center employs drivers to deliver Coca-Cola products.  There are

26  four types of drivers in California: (1) Bulk, (2) OFS, (3) Full Service, and (4) Rapid

27  Delivery.  Plaintiff Kilbourne worked as both a Bulk and OFS driver out of the

28

Oceanside Distribution Center from approximately November 2007 to February 11, 2013.

Coca-Cola uses various technology and reporting systems in connection with its deliveries. Coca-Cola requires each driver to record his work hours using the Kronos computerized timekeeping system. A driver must clock in at the beginning of his shift, clock out and in for the required uninterrupted 30-minute meal period, and then clock out at the end of the work day.[7] Drivers may clock in or out by either swiping a card at the distribution center or by calling a toll-free phone number while in the field. To change or adjust punches, the driver must complete and sign a Time Change Authorization Form ("TCAF"), and only the driver can adjust their time punches. All drivers in California use the Kronos timekeeping system. Supervisors review drivers' Kronos punches 3 to 5 times per week to look for missed punches, missed lunches, and short lunches.

Each morning, drivers are provided with a driver itinerary ("driver itinerary" or "route itinerary"). This itinerary is unique to the route and contains the route number information, driver information (name, identification number, and truck number), date, information about the scheduled stops, an estimate of how long certain tasks

_____

[7] Coca-Cola provides the following notice to all hourly employees regarding its KRONOS Timekeeping Requirements:

> It is critical that an employee's KRONOS record represent an accurate depiction of the hours actually worked by that employee and allows the Company to correctly pay the wages earned in a day. It is each employee's responsibility to accurately and consistently utilize the KRONOS system toward that goal. The following information is provided to help you understand your role in the process;
> . . .
>
> Each employee must consistently punch in/out for all shift starts and ends, and for each meal period beginning and end. If an employee misses any of the punches, an employee is required to complete the necessary paperwork to correct the missed punch in/out. Management will coach an employee who misses any of the required punch in/outs. Failure to modify such behavior will result in progressive discipline up to and including termination.

Defs.' Exh. 12.

will take to complete (i.e. each stop, drive-time between stops), and line-items for delivery.  These itineraries are created by Coca-Cola's centralized West Region planning team and are generated through computerized software programs called SHORTREC, LEO, and Basis.  All Distribution Centers in California use driver itineraries, and supervisors are provided with the same itineraries as the drivers.

Drivers operate in the field using computer handhelds ("handhelds").  These handhelds are loaded with an electronic version of the driver itinerary.  The driver then uses the handheld to access the route information with predicative times and to generate time-stamped prospective and final invoices.  The prospective invoice is the order as originally written.  Once the driver confirms or manually alters the original order upon customer approval, he generates a final, time-stamped invoice for the customer.  To generate an invoice, the driver simply pushes a button on the handheld device, and the invoice prints within seconds.  A driver can generate multiple prospective invoices, but cannot alter a finalized invoice.  A driver does not have to be physically located at a customer's facility to generate the invoice.  All drivers in California use handhelds.

After a driver completes his route and returns to the Distribution Center, the driver returns the handheld to its cradle and completes the "settlement process" in which the handheld uploads and generates a daily report known as a Document Register.  The Document Register is an accounting of the history contained in the handheld based on the time stamps of when the respective driver printed certain documents.  The Document Register also contains the driver's employee and handheld identification number.  Document Registers are generated for all drivers in California.

Beginning in 2011, Coca-Cola began the rollout of its Vehicle Telematics business initiative, first in a pilot location and then throughout various Distribution Centers.  The rollout was mostly complete by Spring of 2013.  Vehicle Telematics is system operated by a third party, Telogis, that tracks the movement of a vehicle based

on the vehicle's specific GPS coordinates.  The system, which must be installed in a particular vehicle, generates data points detailing the actual route execution of the vehicle, including its physical location, direction, speed, and ignition cycle throughout the day.  It also has a feature that allows those with access to the secured website to observe the truck in real time, although driver surveillance is not the initiative's intended purpose.  At the end of each day, Telogis generates two reports from the data it has collected from the truck: (1) the Plan-Versus Actual ("PvA") Detail Report and (2) the Manifest Report (collectively, "the Telogis data reports").  The PvA is a detailed comparison of the executed route versus the preplanned route in the driver itinerary.  The Manifest Report is a summary of the truck's movement throughout the day and shows location, speed, direction and ignition cycles.

However, Coca-Cola did not implement Vehicle Telematics in all Distribution Centers or all of its delivery trucks.  In particular, the Sacramento Distribution Center does not use Vehicle Telematics.  Additionally, although Coca-Cola installed Vehicle Telematics systems in all Bulk and OFS trucks in California, it did not install Vehicle Telematics in all Full Service vehicles.  Vehicle Telematics was implemented in the Oceanside Distribution Center in or around November 2012, and Plaintiff Kilbourne has Telogis data reports for 17 days between November 2012 and January 2013.

## C.  Analysis

Plaintiff moves for certification of two subclasses of California drivers for his off-the-clock and derivative claims.  Plaintiff does not dispute that Coca-Cola's official policy requires drivers to take 30-minute, uninterrupted meal breaks and does not permit drivers to work off-the-clock.  Instead, Plaintiff's overarching theory is that Coca-Cola has a *de facto* policy and/or practice in which drivers routinely perform work activities—specifically, generating invoices, delivering products, and driving between customer locations—while clocked out for meal periods.  According to Plaintiff, his off-the-clock and derivative claims are suitable for class certification because a common method of proof exists—Coca-Cola's own driver records—to

prove its drivers worked while off the clock, and Coca-Cola had constructive knowledge of such work but did nothing.[8]  Plaintiff further contends that his off-the-clock claim is "particularly suited to class treatment" because Coca-Cola has a "corporate charge" or directive requiring its supervisors to review the Driver Manifests and Document Registers, which are the very documents that would show drivers are working while clocked out.  Plf.'s Mot. at 6.

Defendants oppose certification, asserting Plaintiff has failed to show both commonality and typicality under Rule 23(a),[9] and predominance under Rule 23(b)(3).  Because the parties appear to agree that certification in this case turns on whether Plaintiff has demonstrated commonality under Rule 23(a)(2), the Court addresses commonality first.

### 1.    Commonality under Rule 23(a)(2)

Rule 23(a)(2) requires a plaintiff to demonstrate that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  For purposes of commonality, "[e]ven a single [common] question will do."  *Dukes*, 131 S. Ct. at 2556 (internal citation omitted).

However, "[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)).  Thus, the real test is whether a class action can "generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original).  As the Supreme Court has recognized:

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

---

[8] Plaintiff clarifies in his reply brief that he is not contending that Coca-Cola has *actual* knowledge, but instead that the records and the supervisors' purported responsibility to review the records imputes constructive knowledge on Coca Cola.

[9] Defendants do not appear to dispute the numerosity or adequacy of representation requirements under Rule 23(a)(1) and (a)(4) .  Accordingly, the Court does not address these requirements.

> proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id*. In other words, commonality exists where the "determination of [a common contention's] truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014) *cert. denied*, 135 S. Ct. 2835 (2015) (internal quotation and alteration omitted). To demonstrate that class claims would produce a common answer, the party seeking certification must present "significant proof" that the employer operated under a "general policy" or practice. *Wang*, 737 F.3d at 543 (citing *Dukes*, 131 S. Ct. at 2552–53). "If there is no evidence that the entire class was subject to the same allegedly" unlawful policy or practice, then "there is no question common to the class." *Ellis*, 657 F.3d at 983.

"Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Jimenez*, 765 F.3d at 1165. Here, Plaintiff seeks class certification on his off-the-clock and derivative claims only. To establish liability under California law for an off-the-clock claim, the plaintiff must show that "(1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by." *Id.* (quoting *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543, 548 (E.D. Cal. 2010)).[10]

---

[10] Because Plaintiff's overarching theory is that Coca-Cola has a *de facto* policy of pressuring its drivers to work while clocked out for lunch, Coca-Cola's ultimate liability is contingent on proving Coca-Cola should have known its drivers were working while clocked out for lunch. *See Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1051 (2012) ("As all parties agree, liability is contingent on proof Brinker knew or should have known off-the-clock work was occurring."). However, as Plaintiff correctly points out, at the certification stage, the actual answer to this inquiry—i.e. whether Coca-Cola did or did not, in fact, have constructive knowledge that class members were working off the clock—is not currently before the Court. *See Jimenez*, 765 F.3d at 1166 n.5 (finding the defendant's argument that the "policy-to-violate-the-policy" did not exist went to the merits and therefore was "immaterial at this class certification stage"). Instead, at the certification stage, the issue presently before the Court is "whether any answer that the questions

1    Plaintiff asserts that whether Defendants had constructive knowledge of class

2    members' off-the-clock work is an issue capable of classwide resolution "in a single,

3    post-certification stroke," and therefore satisfies the commonality requirement,

4    because Coca-Cola maintains driver records and "*expects* its supervisors to review

5    Telogis reports and document registers with drivers in daily debriefs."  Plf.'s Reply at

6    3 (emphasis in original).  According to Plaintiff, "[his] evidence and arguments that

7    Defendants' constructive knowledge is [capable of] swift, post-certification

8    resolution are two-fold.  One, Defendants undeniably maintain records – Kronos time

9    records, Document Registers, and Driver Manifests – that would show off-the-clock

10   work was taking place.  Two, and what sets this case apart, Coca-Cola charges its

11   supervisors with the responsibility of reviewing these records with drivers during

12   daily driver debrief sessions that would show the work was occurring."  Plf.'s Reply

13   at 2.  In other words, the existence of Coca-Cola's records coupled with the its

14   "corporate charge" or directive requiring supervisors to review those records will

15   generate a common, class-wide answer to the question of whether Coca-Cola should

16   have known class members were working off the clock.  Specifically, Plaintiff frames

17   the question capable of generating classwide resolution as "whether this corporate

18   charge to review the records at issue constitutes constructive notice."  Plf.'s Reply at

19   2.

20   However, Plaintiff puts the proverbial cart before the horse.  Plaintiff sets forth

21   the method of proving Coca-Cola's liability without first establishing the basis for

22   classwide liability—that Coca-Cola implemented a company-wide policy or practice

23   in contravention to California's Labor Code.  Plaintiff fails to demonstrate the

24   existence of Coca-Cola's purported directive requiring supervisors to review either

25   the Document Registers or Telogis reports during driver debriefs.  In his attempt to

26

27   could produce will drive resolution of the class' claims."  *Id.* at n.5.  The Court addresses this issue

28   in detail below.

do so, Plaintiff relies exclusively on two training modules from Coca-Cola's nationwide Delivery Optimization initiative.  *See* Plf.'s Exhs. 81, 84.  However, the record demonstrates that Coca-Cola introduced these modules as training materials during the rollout of its Vehicle Telematics business initiative, and merely intended the modules to be available for use, if needed or wanted, by local distribution center supervisors for instructional purposes.  Moreover, as Plaintiff himself acknowledges, Mr. Lamkin, Coca-Cola Refreshment's Vice President of Direct Store Delivery Planning and Logistics Services, testified that the driver debrief process set forth in the modules is the *recommended*—but not required—process.  Lamkin Depo. at 271–72.  Further, Mr. Lamkin explained that each Distribution Center makes its own decision about how to run its business and whether, and to what extent, to adopt the process set forth in the modules. [11]  Thus, the Delivery Optimization modules are not a company-wide directive throughout all distribution centers in California, and there is no centralized enforcement of the driver debrief process outlined within the modules.  Instead, the modules are simply training materials that articulate a recommended process, which each individual Distribution Center in turn decides whether or not to implement.

Further, Defendants have offered significant evidence in the form of declarations from approximately 20 Distribution Center Managers throughout California, who each represent that his respective Distribution Center does not follow the recommended debrief process outlined in the modules.  Instead, the managers explain that they understand the Delivery Optimization modules to be suggestions.

---

[11]  "[Coca-Cola's] operations make their own decisions about how the run their business, each individual one.  So if a facility says my business is running as expected and – and does not need to utilize the process, then there's nothing that we say that they have to."  *Id.* at 273 (emphasis added).  Mr. Lamkin also reiterated the discretion of the local distribution centers multiple times throughout his deposition.  *See* Lamkin Depo at 17 ("We provide a base platform that allows local operations to determine how and when they use the information to help benefit their operations.");  *Id.* at 35 ("VT platform is made available and used in many ways for CCR for all the locations what we provide services to. Yes.  How that information is used is very much up to the local operation and what the needs of the operation are.").

For example, Aaron Lee, the Distribution Center Manager of the Oceanside
Distribution Center, states that "[t]he Oceanside DC does not follow Delivery
Optimization's suggestions regarding the driver debrief process" and "the supervisors
are not required to and do not consult the document registers, planned versus actual
reports, or the driver manifests during the driver debriefs." Lee Decl., Defs.' Exh.
131 at ¶ 16. The declarations from other distribution mangers reiterate these points[12]
and provide further support that the Delivery Optimization modules do not constitute
a company-wide directive. Plaintiff highlights the declaration of one manager, who
admits to comparing a driver's Kronos records and Telogis report during an
investigation into the driver's timekeeping, to show the records are capable of
showing Coca-Cola whether drivers are working off the clock. *See* Thomason Decl.,
Def.'s Exh. 146 ¶ 19.[13] However, the same supervisor also stated that the practice of
his Distribution Center is for drivers to turn in their Document Registers to the route
settlement department, and that supervisors are not provided with copies of the
Document Register and do not use the Document Registers during driver debriefs.
*Id.* at ¶ 13. Moreover, even assuming the records are capable of showing whether a

---

[12] *See, e.g.*, Brian Allen Decl., Defs.' Exh. 134, ¶¶ 13, 16 (explaining in Sylmar and Lancaster Distribution Centers, "supervisors also do not use the 'planned versus actual reports' during driver debriefs" and "supervisors do not have Telogis reports or document registers with them during the driver debriefs"); Christopher Lenahan Decl., Defs.' Exh. 135, ¶ 13 ("[T]wo of the three supervisors at the Oceanside DC receive the Telogis reports but do not use the Telogis reports during the driver debriefs . . . the supervisors do not have the document registers with them during driver debriefs."); Tim Albrecht Decl., Defs.' Exh. 148 ¶ 15 (explaining that in the Union City DC and Burlingame site, "the [Delivery Optimization] recommendation is not practical or possible for us, so we do not use those documents in connection with the driver debrief, and driver debriefs do not happen everyday. I do not require supervisors to review the Telogis reports or the document registers before a driver debrief, nor would I expect a supervisor to use these documents during a driver debrief"); Ninwa Khoshaba, Defs.' Exh. 144, ¶ 18 (explaining that as Distribution Center Manager for Los Angeles DC, "I have not changed anything about the way I run the LA DC based on Delivery Optimization. . . . Because Delivery Optimization provides only suggested practices, the supervisors are not instructed or required to have the Telogis reports or the document registers with them during the driver debriefs and none of the supervisors do.").

[13] Mr. Thomason also stated that the practice of his Distribution Center is for drivers to turn in their Document Registers to the route settlement department, and that supervisors are not provided with copies of the Document Register and do not use the Document Registers during driver debriefs. *Id.* at ¶ 13.

1   driver performs work off the clock, the declaration illustrates the broad discretion that

2   Coca-Cola affords its Distribution Centers and further underscores that the

3   Distribution Centers in California do not have one common, streamlined approach to

4   reviewing or using driver records.  Accordingly, determining whether supervisors

5   review, or are expected to review, Document Registers and/or Telogis reports during

6   driver debriefs or otherwise, and thus have constructive knowledge of the off-the-

7   clock work, would require an inquiry into each Distribution Center or supervisor's

8   respective practices.

9          The Court finds that Plaintiff has not provided sufficient proof that Coca-Cola

10  has a company-wide directive or "corporate charge" requiring its supervisors to

11  review the Document Registers or Telogis reports.  In the absence of proof of a

12  company-wide directive or common policy, determining if and how supervisors at

13  various Distribution Centers use the driver records, if at all, would require individual

14  inquiries into the practices of the various Distribution Centers.  The necessity for this

15  inquiry cuts against Plaintiff's theory that whether Defendants had constructive

16  knowledge of the off-the-clock work is capable of classwide resolution "in one swift

17  stroke."  Thus, by failing to demonstrate the existence of Coca-Cola's corporate

18  directive or other policy or practice affecting the class as a whole, Plaintiff has failed

19  to show commonality with respect to the question of whether Defendants should have

20  known class members were performing off-the-clock work.

21         During oral argument, Plaintiff's counsel argued that in this Circuit, Plaintiff

22  need not show a company-wide directive, or any common policy or practice for that

23  matter, to satisfy the commonality under Rule 23(a)(2).  Instead, Plaintiff insists that

24  under the Ninth Circuit's decision in *Jimenez*, the existence of the Coca-Cola's

25  records alone, in particular the Kronos timekeeping records and Document

26  Registers,[14] is sufficient to establish commonality.  Plaintiff asserts that *Jimenez*

27

28  ───────────
[14]  At the hearing, the Court raised concerns that the Vehicle Telematics system was implemented at
Distribution Centers in California at different times throughout the Class Period, or in some cases

1    stands for the proposition that "[c]ommonality for off-the-clock work is satisfied

2    when the existence of computer systems or records show work being performed

3    whereas the time records indicate otherwise."  Plf.'s Mot. at 17.

4          However, the Court finds Plaintiff's reliance misplaced.  In *Jimenez*, the

5    plaintiff sought class certification of claims for unpaid overtime and missed meal and

6    rest periods based on the theory that even though the defendant had reclassified its

7    claims adjusters from salaried to non-exempt hourly employees, it still expected class

8    members to work in excess of 40 hours per week without receiving overtime

9    compensation or proper meal and rest breaks.  *Jimenez v. Allstate Ins. Co.*, No. 10-

10   08486 JAK, 2012 WL 1366052, at *1 (C.D. Cal. Apr. 18, 2012), *aff'd* (Sept. 3, 2014).

11   With respect to the overtime claim, the plaintiff asserted commonality existed

12   because the defendant "has a common practice of not following its official policy

13   regarding overtime."  *Id.* at *8.  The district court found that the plaintiff had

14   presented sufficient evidence to support this common-practice theory, including a

15   "company-wide practice of discouraging and 'managing' overtime" among other

16   things.  *Id.* at *9, *22. [15]  Notably, however, the district court denied certification of

17

18

19   not at all, and therefore whether the Telogis data reports were available varied significantly from
     driver-to-driver.  In response to these concerns, Plaintiff's counsel clarified that the Kronos

20   timekeeping data and Document Registers alone are sufficient to constitute a common method of
     proof to satisfy the commonality requirement.

21   [15] Specifically, the district court found:

22            Plaintiff has met his burden of alleging a company-wide policy or practice that results
              in the nonpayment of earned overtime compensation by presenting evidence that

23            supports his contentions that there is: (1) a company-wide practice of discouraging and
              "managing" overtime; (2) imputed knowledge on Defendant's part of the necessity of

24            such overtime in light of heavy workloads, which did not change after the
              reclassification of claims adjusters from exempt to non-exempt; and (3) a company-

25            wide practice of permitting only managers, not putative class members, to record
              employee time, which contributes to under-reporting of overtime worked.

26   *Id.* at *22.  The court discussed Plaintiff's proof of such policies, including evidence that the
     defendant had a state-wide directive to limit the ability to input overtime to managers, which came

27   directly from the head of claims for California; an email from a Frontline Performance Leader, who
     directly oversaw the claims adjusters, with the subject line "Overtime is cancelled! Effective

28   Immediately" and stating "No overtime and no exceptions!"; the fact that each of the 13 Market

the plaintiff's meal and rest period class precisely because the plaintiff had failed to affirmatively demonstrate "any common policy or practice that interfered with adjusters' ability to take breaks other than his generic allegations that adjusters were overworked and did not have time for such breaks." *Id.* at *15. The court further noted that "in the absence of a common practice or policy or some other 'glue' to bind this class, commonality cannot be shown" and therefore "the success of Plaintiff's claims will depend on individualized questions, such as whether a particular adjuster took the legally mandated breaks, and if breaks were missed, why the adjuster failed to take them." *Id.*

On appeal, the Ninth Circuit found the district court did not abuse its discretion in certifying the overtime class. *Jimenez*, 765 F.3d at 1161. At the outset, the Ninth Circuit acknowledged the district court's finding that the plaintiff had brought forth sufficient evidence of the defendant's unofficial policy of discouraging overtime. *See id.* at 1164 n.2.[16] The court found that the plaintiff had sufficiently raised the common questions of "whether the class had worked unpaid overtime *as a result of* Defendant's unofficial policy of discouraging reporting of such overtime," whether the defendant knew or should have known the overtime work was occurring, which the court noted "plaintiffs allege could be shown through either the testimony of managers who saw the class members work scheduled or through an analysis of the telephone and computer systems used by the class members;" and finally whether Defendants stood idly by. *Id.* at 1165–66 (emphasis added).

---

Claims Offices located throughout California had the same overtime approval process; and a functional limit on overtime due to each MCO's set compensation budgets. *See id.* at *5–9.

[16] "The district court did not certify the class with respect to the meal break and wage statement claims because, in contrast to the off-the-clock claim, *Jimenez did not bring forth evidence of specific policies or practices* that would have caused claims adjusters as a group not to take breaks." *Id.* at 1164 n.2 (emphasis added).

1    Thus, contrary to Plaintiff's argument, the Ninth Circuit's decision in *Jimenez*

2  does not stand for the proposition that the existence of records alone is sufficient to

3  establish commonality.  Rather, the plaintiff in *Jimenez* had affirmatively

4  demonstrated evidence of the defendant's unofficial policy of discouraging overtime,

5  and it was precisely this showing that established the "glue" necessary to generate a

6  common answer to the class.  *See Jimenez*, 2012 WL 1366052, at *15; *see also Braun*

7  *v. Safeco Ins. Co. of Am.*, No. CV 13-00607, 2014 WL 9883831, at *14 (C.D. Cal.

8  Nov. 7, 2014) (explaining that in *Jimenez*, "[b]ecause the overtime claims were based

9  on a common 'policy to violate the policy,' there was 'glue holding together the

10  proposed class").  Accordingly, the Court finds the facts of this case distinguishable

11  from *Jimenez* given Plaintiff has not provided evidence of Coca-Cola's purported

12  directive requiring its supervisors to review Document Registers during driver

13  debriefs.

14    The Court finds the Ninth Circuit's recent unpublished decision in *Green v.*

15  *Federal Express Corporation*, -- Fed. App'x --, 2015 WL 3825302 (9th Cir. June 22,

16  2015) further supports the Court's conclusion that an employer's records alone,

17  without proof of a common policy or practice, are insufficient to generate common

18  answers to the question of whether the employer should have known of the off-the-

19  clock work.  There, the Ninth Circuit found that the district court did not abuse its

20  discretion in denying certification of the plaintiff's working meal break class because

21  the plaintiff's "common method of proof, electronic scans of packages during

22  designated meal breaks, does not show that FedEx knew or should have known that

23  its employees were working during their break periods."  *Id.* at *2.  The court

24  reasoned that FedEx did not have actual knowledge because it did not regularly

25  review the electronic data that would establish work was performed during meal

26  breaks.  The court further reasoned that FedEx did not have constructive knowledge

27  because it "is not obligated to police its employees' meal breaks" and therefore "had

28  no obligation to sift through the volumes of electronic data produced by the scanning

1   devices to determine whether its employees were actually taking their authorized

2   breaks." *Id.*  Similar to the plaintiff in *Green*, Plaintiff argues that the existence of

3   Coca-Cola's Kronos records and Document Registers alone are sufficient to establish

4   a common method of proof among the class.  However, like the employer in *Green*,

5   Coca-Cola supervisors have no obligation to sift through its various invoicing and

6   GPS data to ensure drivers were not working while clocked out.  Further, while it is

7   undisputed that Coca-Cola supervisors review Kronos records for missed meal

8   periods, Plaintiff has failed to provide evidence that Coca-Cola requires supervisors

9   to review Document Registers—the documents that would show the drivers were

10  working while clocked out for lunch.  Thus, without evidence of a Coca-Cola

11  company-wide practice of reviewing and comparing the Kronos Data with the

12  Document Registers, Plaintiff's purportedly common method of proof amounts to no

13  more than determining liability on an individualized basis.

14          Finally, Plaintiff insists that because motivation is not an element of an off-the-

15  clock claim, he need not show why each driver worked off-the-clock.  *See* Plf.'s Mot.

16  at 6; Plf's Reply at 2 ("The law does not require Plaintiff to show the reasons why he

17  worked off-the-clock, such as pressure from Coca-Cola.").  However, this argument

18  undermines Plaintiff's overarching theory that Coca-Cola is liable on a *classwide*

19  basis precisely because it has a *de facto* policy and/or practice of pressuring its

20  drivers to work through lunch to meet the predictive times.  Further, the only

21  evidence that Plaintiff offers with respect to Coca-Cola's purported *de facto* policy of

22  pressuring its drivers to work through lunch is anecdotal evidence in the form of

23  almost identical putative class member declarations, which is not "significant proof"

24  of a common policy or practice.  Without a showing of this unofficial policy or

25  practice—or any other common thread to serve as the "glue" affecting the class as a

26  whole—Plaintiff does not put forward a contention capable of generating a common

27  answer among the class.  *See Dukes*, 131 S. Ct. at 2552 ("Without some glue holding

28  the alleged *reasons* for all those decisions together, it will be impossible to say that

examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.") (emphasis in original); *Brinker*, 53 Cal. 4th at 1051–52 ("The only formal Brinker off-the-clock policy submitted disavows such work, consistent with state law.  Nor has [the plaintiff] presented substantial evidence of a systematic company policy to pressure or require employees to work off the clock, a distinction that differentiates this case from those he relies upon in which off-the-clock classes have been certified."); *Ellis*, 657 F.3d at 983 ("[T]he district court was required to resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*.  If there is no evidence that the entire class was subject to the same allegedly discriminatory practice, there is no question common to the class.") (emphasis in original); *Koike v. Starbucks Corp.*, 378 Fed. App'x 659, 661 (9th Cir. 2010) ("Even giving full credence to the evidence presented by Koike, this evidence tends to show only that business pressures exist which *might* lead assistant managers to work off-the-clock.") (emphasis in original).

In sum, Plaintiff has not satisfied his burden of providing evidence of the existence of a Coca-Cola company-wide directive requiring driver supervisors to review and compare the Kronos timecards and Document Registers, or any other unofficial policy or practice the could serve as the "glue" necessary to generate common answers on a classwide basis.  Because Plaintiff has failed to carry his burden of demonstrating commonality under Rule 23(a)(2), certification of the off-the-clock claims, and any claims derivative thereof, would be inappropriate.[17]

## 2.   Predominance under Rule 23(b)(3)

Rule 23(b)(3) requires that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added).  "A principal purpose behind Rule 23 class

---

[17]  In light of the Court's conclusion, it need not reach Defendants' argument that Plaintiff has also failed to demonstrate typicality under Rule 23(a)(3).

actions is to promote efficiency and economy of litigation." *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (internal citation and quotation marks omitted).  The predominance analysis under Rule 23(b)(3) focuses on "the relationship between the common and individual issues" in the case and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang*, 737 F.3d at 545 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).  The Supreme Court has recognized that "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013).

As set forth above, Plaintiff has failed to demonstrate any contention capable of class wide resolution, and therefore has failed to satisfy the commonality requirement under Rule 23(a).  Thus, class certification under Rule 23(b)(3) is likewise improper.  *See Wang*, 737 F.3d at 545 ("[T]he district court can certify a class under Rule 23(b)(3) *only if* it first again determines that plaintiffs meet the commonality requirement under Rule 23(a).") (emphasis added).

Moreover, even if the existence of the Kronos timekeeping data and Document Registers alone could constitute a common method of proof for the class's off-the-clock claims, individualized inquiries would predominate over any issue common to the class.  For example, in his expert declaration filed in support of Plaintiff's motion for class certification, Mr. Taylor explains that a comparison of the Kronos timekeeping data with the Document Registers would be required for each driver based on that driver's individual records.  *See, e.g.*, Taylor Decl. ¶ 12 ("By comparing the timestamps from the Document Registers and the Kronos timekeeping data, I can determine the number of instances and for how long each driver performed work (generating invoices) for which the driver was clocked out and not paid.").  Thus, establishing liability for an off-the-clock claim—in particular whether a class member worked off the clock without compensation, and Coca-Cola should have known of such work—would require an individualized inquiry into the specific records of each

individual class member, whether the supervisor had access to each driver's records, and whether and to what extent the supervisor reviewed or compared each driver's records.  *See Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 628 (S.D. Cal. 2014) ("It is clear that considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action.") (quoting *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1020 (9th Cir. 2011)).  Thus, even if a common issue exists, the Court finds individualized inquiries would predominate.  *See, e.g.*, *Brinker*, 53 Cal. 4th at 1052 ("On a record such as this, where no substantial evidence points to a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off the clock, how long they worked, and whether [the employer] knew or should have known of their work."); *Green*, 2015 WL 3825302, at *2 ("Therefore, individual issues concerning whether an employee actually worked during a meal break, and brought it to the attention of FedEx, would predominate."); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 640 (N.D. Cal. 2010) ("In addition, most of plaintiff's arguments—particularly the arguments regarding the missed meal breaks and the arguments regarding off-the-clock and overtime claims—focus on individualized inquiries.  The fact that the information relating to individual employees may be available (or capable of being extracted) from Crab Addison's Aloha system and other computerized systems does not mean that these are issues that are not dependent on an individualized inquiry."); *Stiller*, 298 F.R.D. at 630 (listing cases where the plaintiff failed to satisfy predominance requirement because individualized inquiries were required to establish whether putative class members performed work off the clock); *Rai v. CVS Caremark Corp.*, No. 12cv08717-JGB VBKX, 2013 WL 10178675, at *9 (C.D. Cal. Oct. 11, 2013) ("In the absence of common evidence that putative class members were regularly forced to work through meal and rest periods when no other manager or supervisor was on duty, the Court

1  would need to make individual inquiries as to why [each] individual missed meal
2  periods.").

3        Because individualized inquiries would predominate, the Court finds class
4  certification of Plaintiff's off-the-clock claim would also be improper under Rule
5  23(b)(3).

6  <u>CONCLUSION</u>

7        For the reasons set forth above, the Court finds Plaintiff has failed to carry his
8  burden of demonstrating commonality under Rule 23(a)(2) and predominance under
9  Rule 23(b)(3).  Accordingly, the Court **DENIES** Plaintiff's motion for class
10  certification of Plaintiff's off-the-clock claim.  Further, because Plaintiff's waiting
11  time penalties and unfair business practices claims are derivative of the off-the-clock
12  claim, the Court **DENIES** certification of those claims as well.

13        **IT IS SO ORDERED.**

14

15  Date: July 29, 2015

16                         Hon. Michael M. Anello
17                         United States District Judge

18

19

20

21

22

23

24

25

26

27

28